**Duane Gordon BIXLER, Respondent,**

v.

**STATE of Minnesota, pet., Appellant.**

**No. C5–97–181.**

Supreme Court of Minnesota.

Aug. 6, 1998.

Hubert H. Humphrey, III, Atty. Gen., Michael Freeman, Hennepin County Atty., Michael Richardson, Asst. County Atty., for appellant.

Mark D. Nyvold, St. Paul, for respondent.

## OPINION

STRINGER, Justice.

In this appeal brought by the State of Minnesota regarding respondent's petition for postconviction relief we consider whether the court of appeals erred in concluding that because respondent is borderline mentally retarded, his constitutional right to present a meaningful defense was violated when the trial court refused to allow psychological expert testimony relating to the credibility of respondent's confession. We hold that the trial court did not abuse its discretion in excluding the expert testimony and therefore reverse the court of appeals.

On March 9, 1994, Lynne Bixler called the police and reported that her husband Duane Bixler had sexually abused their 2-1/2-year-old daughter, S.B., a child with Downs Syndrome. When the police arrived at the Bixler residence, Lynne Bixler handed the officer a plastic bag containing what she believed to be a scab from her husband. She told the police that she found the scab between S.B.'s clitoris and labia when she changed S.B.'s diaper at approximately 8:00 a.m. that morning. She explained that her husband was mentally retarded due to a brain injury and acted like a 15 or 16-year-

old. Duane Bixler knew his wife had called the police and entered the room while the officer was talking with his wife. He said that he did not do anything wrong. The officer noticed that Duane Bixler had a fresh scar on his neck that was shiny, dry and concave. Lynne Bixler later told the police and a social worker that Duane Bixler had a habit of picking at his scabs and putting them in his mouth. Duane Bixler later acknowledged to the police that he had scabs on his body from skin graft surgery 2 months earlier related to severe burns that he received when he was 5-years-old but he thought they were gone by March 9, 1994. The officer did not arrest Duane Bixler but took the bag containing the scab with him.

Later that day a police detective phoned Lynne Bixler to set up a time for an interview. Duane Bixler testified that his wife asked him to drive her to the police station so she could talk with the detective. When he returned to pick her up, Lynne Bixler had just told the detective that she believed her husband had put one of his scabs in his mouth and then performed oral sex on their daughter S.B. Apparently based on this information the detective told Duane Bixler that he wanted to ask him a few questions. The detective interrogated Bixler in a room 14' × 16' in size, with a window looking out on the investigators' cubicles. The room was brightly lit by fluorescent lights and contained a table and some bookshelves. The interrogation lasted for little more than an hour with an 8-minute bathroom break. At the beginning of the interrogation, the detective asked Duane Bixler if he knew why he was there.[1] He responded that he did, but that he did not abuse S.B. Shortly after the interrogation began, the detective advised Bixler of his *Miranda* rights, which he then waived. For the next hour Bixler denied he sexually abused S.B. The detective counseled him that in order to get help for his problems related to his relationship with his wife, his abuse of drugs and his sexual abuse of S.B. he would have to first admit that he did it. At this point in the interrogation Bixler admitted that he had licked S.B.'s vagina. He

---

1. The detective had spoken to Bixler a couple of months earlier regarding an allegation that a third party had sexually abused the Bixlers' 5-year-old daughter.

told the detective that he did it because S.B. liked it and because his wife would not have sex with him. The detective then gave him another *Miranda* warning and tape-recorded his confession. The recording was transcribed, Bixler was given a copy and signed it after making several changes. The detective then placed him under formal arrest.

At the *Rasmussen* hearing, the interrogating detective testified that he had little experience interviewing mentally retarded individuals and acknowledged that he had exerted pressure on Bixler to persuade him to confess. Bixler testified that he was 31–years–old, had a 9th grade education, and had sustained a brain injury from a car accident in 1981. He also testified that during the interrogation, despite his repeated denial of abusing S.B., the detective told him that he was in denial and that he could not go into any kind of treatment unless he admitted that he was a child molester. He further testified that he admitted to abusing S.B. because he thought it was the only way he could get treatment, he was afraid of going to jail, he could not stand the pressure of being asked the same question over and over—"six times" and he thought the interview would never end unless he admitted that he abused S.B. Although Bixler acknowledged that he had been questioned by the police previously relative to a drug charge, he said that never before had he felt pressured by the police to admit anything. Regarding the present interrogation, in addition to questioning Bixler about S.B., the detective asked Bixler several questions in succession as to whether he sexually abused either his 5–year–old or 1–year–old daughter. When the prosecutor asked Bixler on cross-examination how he was able to resist admitting that he molested his youngest daughter, he responded that the detective did not pressure him as much about that daughter as he did about S.B.

Defense counsel then called Dr. Perkins, a psychologist, to the stand and in response to the state's objection that expert testimony of Bixler's personality characteristics is irrelevant, defense counsel made an offer of proof that Dr. Perkins would testify that he examined Bixler and that because of his low intelligence he is susceptible to coercion. Defense counsel argued that his statement was therefore a product of coercion and was involuntary, and that Dr. Perkins would further testify that Bixler is vulnerable to suggestion and intimidation and has a tendency to say what authority figures want to hear in order to bring an end to the pressure he feels from persons in authority. The *Rasmussen* court applied a totality of the circumstances test and refused to permit Dr. Perkins to testify at the hearing, concluding that Bixler responded appropriately throughout the proceedings, he added explanation when he thought it was necessary, he had experience with the criminal justice system including prior convictions, incarceration, and numerous interviews with the police, he was familiar with his *Miranda* rights, he had a very good memory for detail, the interrogation was not long and was conducted in an appropriate environment at an appropriate time, he agreed to be interviewed, and there was no evidence of any maltreatment. *See Bixler v. State*, 568 N.W.2d 880, 883–84 (Minn.App.1997) (describing the *Rasmussen* court's analysis). The *Rasmussen* court noted his mental impairments but found that they did not, in light of the other factors, make it impossible for him to give a voluntary confession. The *Rasmussen* court therefore rejected the offer of proof and concluded that Duane Bixler's confession was admissible.

On three occasions during Bixler's trial defense counsel again offered the testimony of Dr. Perkins regarding the reliability of Duane Bixler's confession. On each occasion the state objected arguing that he was attempting to revisit the issue of voluntariness pertaining to admissibility. The trial court rejected the expert testimony as lacking foundation and irrelevant.

The jury found Bixler guilty of first-degree sexual misconduct under Minn.Stat. § 609.342, subd. 1(a), subd. 2, and § 609.101, subd. 2 (1994) and he was sentenced to 110 months in prison. Bixler did not file a direct appeal, and his petition for postconviction relief was denied on a ruling that Dr. Perkins' testimony was properly excluded regarding the pre-trial issue of voluntariness

and the trial issue of credibility of the confession because the proffered testimony was "unrelated to the manner in which the confession was obtained." On appeal, the court of appeals affirmed as to the admissibility of the confession concluding that it was voluntary and that it was not error to exclude Dr. Perkins' testimony from the *Rasmussen* hearing, but disagreed with the trial court as to the exclusion of Dr. Perkins' testimony at trial regarding the credibility of Duane Bixler's confession. The court held that Bixler must be allowed to challenge the truthfulness of his confession at trial and competent expert evidence demonstrating that the defendant is susceptible to coercion was admissible as it may be important as to the jury's consideration of why he claims that he is innocent after having confessed to the crime. *Bixler*, 568 N.W.2d at 885. On this basis the court of appeals reversed and granted Duane Bixler a new trial. *Id.* We granted the state's petition for review and hold it was not an abuse of discretion for the trial court to determine that the psychological expert testimony was not admissible.

The Sixth and Fourteenth Amendments of the United States Constitution and Article I, section 7 of the Minnesota Constitution guarantee criminal defendants the right to present a meaningful defense. *See* U.S. Const. amends. VI, XIV; Minn. Const. art. I, § 7; *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992). The court of appeals relied heavily on *Crane v. Kentucky* in reaching its conclusion that the trial court had no discretion to exclude the expert witness testimony regarding Bixler's susceptibility to coercion. We disagree with the court of appeals' analysis of *Crane*. In *Crane*, the defendant was a minor who testified that the police badgered him into making a false confession when he was surrounded by as many as six police officers in a windowless room and interrogated for a long period of time while prohibited from telephoning his mother. 476 U.S. at 685, 106 S.Ct. 2142. The United States Supreme Court reversed the Supreme Court of Kentucky distinguishing the pretrial issue of voluntariness of a confession from the trial issue of its credibility, and stated that "evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess." *Id.* at 687–88, 106 S.Ct. 2142. Thus, "the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence." *Id.* at 689, 106 S.Ct. 2142. The Supreme Court's concern with the wholesale exclusion of evidence bearing on the credibility of the confession at trial is that:

> [S]tripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?

*Id.* Although the Supreme Court concluded that the defendant was deprived of his constitutional right to present a complete defense in that case, *id.* at 687, 106 S.Ct. 2142, it noted that judges have "$wide latitude' to exclude evidence that is $repetitive ..., only marginally relevant' or poses an undue risk of $harassment, prejudice, [or] confusion of the issues.' " *Id.* at 689–90, 106 S.Ct. 2142 (citation omitted). The trial court's determination to exclude Dr. Perkins' testimony was precisely the "wide latitude" accorded in *Crane*.

Turning next to our rules of evidence, Rule 702 of the Minnesota Rules of Evidence governing the admissibility of expert testimony is consistent with the discretion accorded the trial court in *Crane* :

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Minn. R. Evid. 702. We have recently held that the admissibility of expert testimony has generally rested in the discretion of the trial court and will not be reversed absent clear error. *State v. Koskela*, 536 N.W.2d 625, 629 (Minn.1995). In *Koskela*, not unlike the matter now before us, we held that the trial

**256**

court did not abuse its discretion in refusing to permit a psychologist to testify as to whether the defendant fit the profile of a schizoid personality disorder. *Id.* at 630. There, the defendant confessed to breaking into a woman's apartment and stabbing her to death. *Id.* at 627. He claimed that he was denied his constitutional right to a fair trial when the trial court allowed a psychologist to testify as to the nature of the disorder that the defendant claimed affected the reliability of his confession, but did not allow the psychologist to testify as to whether the defendant was a victim of the disorder. *Id.* at 629–30. We held that to be a matter for the jury to determine and that the trial court was well within its discretion in excluding the testimony. *Id.*

Similarly Rule 403 of the Minnesota Rules of Evidence vests the trial court with broad discretion to exclude evidence, even though relevant, "if its probative value is substantially outweighed by the danger of unfair prejudice * * * or needless presentation of cumulative evidence." Our reluctance to reverse the trial court on an issue of admissibility of evidence of this nature is well illustrated by the offer of the psychological expert testimony in this case—testimony that was nothing more than a composite of personal characteristics that might render an individual more susceptible to wanting to please an authority figure, and having far less scientific specificity than the schizoid personality disorder in *Koskela.*

Clearly the trial court was well within its discretion in ruling that the jury, without the testimony of the psychological expert, was fully capable of observing and understanding Duane Bixler's propensity to please authority figures, and taking those observations and that understanding into account in evaluating his confession.

Reversed.