## A97A1589. BARLOW v. THE STATE.
(494 SE2d 588)

BEASLEY, Judge.

Timothy Bryan Barlow was convicted of two counts of molesting a seven-year-old child, and the court denied his amended motion for new trial. A videotaped interview of the child by a police detective is the subject of Barlow's two enumerations of error. He challenges its admission as evidence and the court's refusal to permit expert evidence concerning interview techniques used. Neither enumeration requires a new trial.

1. Barlow contends the videotape was incompetent evidence because it did not reveal "sufficient indicia of reliability" as required by OCGA § 24-3-16, particularly because expert testimony plus inconsistencies between the videotaped statement and the victim's trial testimony show the child's "general lack of credibility." His expert witness, a psychologist, testified at the hearing about her conclusions concerning the "reliability of the interviewee." She stated that the interviewer, an investigator, posed leading questions rather than open-ended questions; that due to an apparent lack of spontaneity, the victim appeared to have been coached; that the victim was "reinforced for being smart and bright" by the investigator; and that the atmosphere was "stiff and uncomfortable." Based on these factors, she concluded that the interview and hence the child's story were unreliable.

A trial court has broad discretion concerning the admission of evidence. *Gregg v. State*, 201 Ga. App. 238, 240 (3) (a) (411 SE2d 65) (1991). When considering whether to admit a child's out-of-court statement, a court must determine whether the circumstances show sufficient "indicia of reliability." Id. at 240 (3) (b). A non-exhaustive list of factors are the environment in which the statement is made, its spontaneity, the child's general demeanor and condition, the presence or absence of coaching, and the consistency of the child's out-of-court statements. Id.

Here, as in *Penaranda v. State*, 203 Ga. App. 740, 741 (2) (417 SE2d 683) (1992), the court conducted a hearing outside the jury's presence and considered the context and nature of the interview. Relying on the factors set out in *Gregg*, it found the atmosphere in the "child-friendly" interview room to be reasonably comfortable and noted the absence of a "burdensome" number of people, including the child's mother and family. The court further found the child to be "very intelligent" and emotionally stable. This cooperative demeanor did not indicate to the court her desire to "please" anyone but instead showed that "she was trying to tell her story and get out of there." The court observed no threats or promises and concluded that the videotaped statements were consistent with her other statements. In consequence, the court ruled the videotape was admissible because it was "a reliable instrument of the recollection and recording of the child's statement."

This did not constitute an abuse of discretion, as the evidence supported the ruling. The video camera was hidden behind a mirror, and only two detectives, dressed in civilian clothes, appeared to be present in the room. See generally *Knight v. State,* 210 Ga. App. 228, 229 (435 SE2d 682) (1993). Neither detective made any threats or promises during the interview. As in *Knight*, the child appeared to be "reasonably calm, composed, and coherent, and to understand the need for truthfulness." Id. The mother testified that she did not coach the victim and that the child did not have a history of telling lies. See *Tucker v. State*, 208 Ga. App. 441, 442 (430 SE2d 811) (1993). There is no evidence the child had been interviewed by law enforcement officials before the videotaped interview. See generally *Heard v. State*, 221 Ga. App. 166, 168 (471 SE2d 22) (1996).

Barlow argues that the child's statements during the interview were inconsistent and that the videotape was inconsistent with her trial testimony. It is true that at times during the interview the victim appeared confused as to the location of the alleged incidents; she sometimes stated she could identify the locations and at other times said she could not. According to Barlow, these inconsistencies were often caused by the detective's "compound" and "confusing" questions. He characterizes other portions of the child's statement as being confusing. These alleged inconsistencies do not invalidate the interview but are simply one of the many factors the trial court was required to consider in determining threshold reliability.

Conflicts between the taped statements and trial testimony were subject to a cross-examination and to argument to the jury that these alleged inconsistencies undermined the victim's credibility. As stated in *Ware v. State*, 191 Ga. App. 896, 897 (2) (383 SE2d 368) (1989), "conflicts between the videotaped statement and the testimony of the child at trial would not necessarily render the former inadmissible,

but would rather present a question of credibility of the witness to be resolved by the trier of fact, here the jury." See *Gregg*, supra at 241 (3) (c) (cross-examination); *Heard*, supra at 168 (2) (cross-examination).

2. The defendant was not deprived of presenting competent, relevant evidence to the jury on an issue in the case. The record and the law compel the conclusion that the trial court did not err in excluding the testimony of the psychologist. She was offered by Barlow to show that the detective's method of interviewing the child was so flawed that it elicited statements which were not credible.

No precedent is cited by Barlow for the novel idea that a defendant is entitled to attack the credibility of a child-witness videotaped interview, which the jury could and did see for itself, by calling a behavioral psychologist to testify that the techniques employed by the interviewer did not meet professional standards or protocols. Were this the law, then the testimony of an accuser in court would also be subject to attack by such a trained specialist. A psychologist would be able to challenge the prosecutor's or the defense counsel's manner of eliciting testimony.

Such assistance is not needed by a jury to assess credibility, for it can size up the conditions, environment, and manner of inquiry itself. Questioning children to ascertain truth is commonplace. Ordinary women and men can detect the suggestibility of leading questions even if they do not know the legal term for such answer-guiding queries. Ordinary women and men can determine the effect of surroundings and circumstances on a person's statements, which is precisely why the United States Supreme Court reversed the conviction in *Crane v. Kentucky*, 476 U. S. 683 (106 SC 2142, 90 LE2d 636) (1986), a case cited by defendant. Ordinary women and men are selected from the community for the very purpose of weighing evidence and judging credibility of sworn witnesses, including children, in the truth-seeking process. *Hicks v. State*, 175 Ga. App. 243, 244 (4) (333 SE2d 113) (1985); *Crane*, supra at 688, and cases cited therein. Any determination concerning witness credibility is a matter solely within the jury's province. See, e.g., *Gorski v. State*, 201 Ga. App. 122, 123 (2) (410 SE2d 338) (1991) (applies this fundamental rule). In fact, the court in *Gorski* rejected proposed testimony of the opinion of a psychologist on "'the truthfulness or credibility of the victim [because it] was not beyond the ken of the jurors.' [Cits.]" Id.

It is futile for Barlow to attempt to distinguish the purpose of the proposed testimony as being to share a body of knowledge concerning the proper method of interviewing a child and the possible effect of techniques the detective used. That is just another way of saying that the purpose was to challenge the believability of the child's statements to the detective. What was at issue was not whether the

detective followed questioning standards set by psychologists' professional organizations but rather whether the child's responses were truthful, considering her demeanor, behavior, manner of wording her responses, content of her responses, surroundings, and all other circumstances of her jury-observed out-of-court statements.

Defendant cites *Crane* as analogous and quotes the portion of that opinion which restates the bedrock principle that due process and Sixth Amendment rights are violated if "competent, reliable evidence bearing on the credibility of [an out-of-court statement is excluded] when such evidence is central to the defendant's claim of innocence." *Crane*, supra at 690.[1] Crane's conviction was reversed because testimony from two police officers about the environment in which the police secured his confession was excluded. Crane had sought to show that the confession was unworthy of belief because he, a teenager, was "detained in a windowless room for a protracted period of time, . . . surrounded by as many as six police officers during the interrogation, . . . had repeatedly requested and been denied permission to telephone his mother, and . . . had been badgered into making a false confession." Id. at 685. The Supreme Court held that defendant had a right to make the jury aware of these circumstances, so it could determine whether the physical and psychological environment tainted the confession. The trial court had too narrowly considered the relevance of the evidence, correctly finding it relevant to the legal determination of voluntariness but incorrectly concluding that it therefore was not relevant to the factual determination of credibility. The "evidence about the manner in which a confession [is] secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess," the court confirmed. Id. at 688.

The same is true for the inculpatory out-of-court statement of the victim in a child molestation case. And in this case the jury had some of those surrounding details from the testimony of the interviewing detective, who was subject to cross-examination, and from its observation of the videotape twice.

Detective Brian, who had long been assigned to the crimes against children unit, testified that the interview took place at the Open Gate, a shelter for abused children, in the video room equipped for just such interviews. The mother brought the child, and he talked to her first. Then he interviewed the child, in the presence of one other seated officer. Afterwards, they and the child's mother and possibly her father went to locations identified by the child during the

---

[1] On appeal, Barlow invokes the due process clause of the Georgia Constitution, Art. I, Sec. I, Par. I, and the due process clause of the United States Constitution, Amendment 5. The latter applies only to federal proceedings, but the Fourteenth Amendment due process requirement applies to the states, as recognized in *Crane*, and thus it applies here.

interview as places where the acts were committed. They even went to the drug store where the child led the detective to the aisle where the Vaseline was displayed.

Defendant did not cross-examine the detective regarding the environment in which the child was interviewed or for how long, which he could have done had it been intimidating or in any way suggestively impacting on her statements. There was good reason to omit cross-examination in this regard, for Detective Brian had testified during the pretrial reliability hearing conducted pursuant to OCGA § 24-3-16. He had testified that while he was first talking with the mother, the child was in the playroom playing with toys, that the approximately 10′ by 15′ room where the child was interviewed is designed for children, with larger pink chairs for adults and a smaller chair for children with a small table so they feel comfortable. The room is carpeted and has children-type pictures on the wall. The video camera is hidden behind a one-way mirror. The psychologist did not know most of these facts, because she only observed the videotape. The jury knew the duration of the interview, and it saw how the detective and policeman were dressed, the easy chairs they and the child sat on, and the small table around which the three were seated. So, unlike the situation in *Crane*, the circumstances of the interview and the environment in which it was conducted were not kept from the jury by the exclusion of any offered evidence.

Defendant sought to introduce the testimony of Dr. Robbins, the psychologist, about "the proper method of interviews, because the court has admitted into evidence an interview with [the child]." When asked by the court what the purpose of her testimony was, defendant's counsel responded that she would supply the reason the child told the story displayed in the videotape, i.e., that she was conditioned and led to do so. The psychologist would attack the method as posing leading questions and questions that were not open-ended, as well as praising the child for certain answers she gave. In the psychologist's opinion, this made the child's statements unreliable.

Reliability of a child's statement is a legal question and is subject to court determination under OCGA § 24-3-16. The court must assure that, before a child's out-of-court statement describing sexual contact is admitted into evidence, "the circumstances of the statement provide sufficient indicia of reliability." In this instance, the court performed its task carefully and after extensive analysis of factors related to reliability.

Although the trial court heard the psychologist's testimony over objection by the State during the pretrial hearing, it did so not necessarily because it was admissible on the issue of reliability but because, in the court's words, "I'm always willing to learn from experts, and I'll overrule the objection and hear what the witness has

got to say." Later, when the psychologist was offered as an expert during trial, the court disclosed that it had not been "greatly impressed" by her testimony, and it expressly did not find her to be an expert on this subject. The court correctly ruled at trial that what her testimony was offered for "is not above the ken of common man to understand . . . nothing unique that the jury needs an expert opinion . . . to explain" and that, instead, it is a subject for argument to the jury. The court's reference is obviously to the issue of credibility, not reliability, the legal issue previously set to rest by the court itself. Credible means capable of being credited or believed, worthy of belief; reliable means worthy of dependence or reliance. Webster's Third International Dictionary, unabridged. They are shades of the same attribute. The court makes the threshold decision as to whether the evidence is sufficiently reliable to submit it to the jury to make the final decision whether to believe it as true.[2]

The psychologist would have testified that the interviewer's questions influenced the content of the child's responses because some questions were leading, some were not open-ended but instead directional, questions that were repetitive suggested that the first answers were not acceptable, and the child was reinforced by praise for correct answers to test questions not related to the incidents. Aside from the manner of questioning, the psychologist based her opinion on what she regarded as an intimidating environment because it was "very stiff and uncomfortable" for a small child with two big men, and also a suggestion of coaching and lack of spontaneity raised by the nature of the child's answers.

These were all matters the jury could observe and, from common knowledge, weigh without scientific expertise to enlighten it. They were all matters from which the jury, drawn from a cross-section of the community, could judge *credibility*, just as the trial court, without the assistance of an expert in psychology, could consider them in its own factfinding of *reliability* under the instructions of *Gregg v. State*, supra at 240 (3) (b). They were all matters which defendant could argue based on the evidence. The jury was not handicapped in its factfinding of guilt or innocence by the absence of the expert's opinion.

A new trial is not warranted.

*Judgment affirmed. Andrews, C. J., Ruffin and Eldridge, JJ., concur. McMurray, P. J., concurs in Division 1 and in the judgment.*

---

[2] Like the Georgia statutory test for admission of a child's statement describing sexual contact or physical abuse, "reliability" is also the constitutional due process test for admission of testimony concerning out-of-court identifications. See *Neil v. Biggers*, 409 U. S. 188, 197-201 (93 SC 375, 34 LE2d 401) (1972).

*Birdsong, P. J., and Smith, J., concur in Division 1 and dissent as to Division 2 and the judgment.*

SMITH, Judge, concurring in part and dissenting in part.

I concur fully with Division 1 but must respectfully dissent from the majority's holding in Division 2.

Barlow sought to present expert testimony on the narrow issue of the proper method of interrogating a child. His witness's expertise lay in the field of adolescent family therapy. She stated that she had testified as an expert in other child abuse cases, giving her opinion about videotapes, specifically stating her opinion about interview techniques used in the tapes. The witness testified concerning standards used by her in evaluating videotaped interviews. She stated that these standards, generated by the American Psychological Association and the Georgia Psychological Association, are set out in textbooks and that she had learned about them in large part by attending continuing education seminars and workshops. When asked to identify the standards, the witness stated that the interview atmosphere should be comfortable and that the interview should be done promptly after the alleged abuse is reported. She emphasized that questions should be "very open-ended, especially of children ages six and seven and older."

It is significant that the detective who primarily conducted the interview testified that he had attended numerous interview schools and child abuse investigation schools designed to instruct in methods for interviewing alleged child abuse victims. In fact, he was an instructor at schools concerning child abuse investigation. At these schools he learned, among other things, to ask open-ended, rather than leading questions.

With respect to the videotape in this case, the expert stressed the importance of open-ended questions and gave examples of proper questioning techniques.[3] She found many of the questions posed by the interviewers to be leading, rather than open-ended. In particular, she noted the interviewer twice mentioned that the victim's mother told him "something happened" involving Barlow. In the expert's opinion, alluding to the victim's mother while asking these leading questions could have influenced the victim's answers. She also opined that the victim appeared to have been coached. She testified that the detail with which the victim told her story was unusual for a seven-year-old child and that it appeared to her the victim had told her

---

[3] For example, rather than ask "What did Tim do? Did he touch you somewhere?" the expert suggested a more proper question would be "Did something happen?" According to the expert, the former type of question effectively was "putting words in [the victim's] mouth."

story several times. The witness noted that the child was reinforced by the interviewers, who would tell her she was "smart" for saying "what she thinks he wants her to say." She testified that "[a]ll children want to be patted on the back and told they're smart." The witness found the interview environment to be intimidating.

The information about which the expert testified was not within the ken of ordinary people. She did not testify about the ultimate issue: whether the victim had or had not been sexually abused. The focus of her testimony outside the jury's hearing was on the interview techniques she observed and her professional opinion about the psychological effect on a child of these techniques. Her knowledge was gleaned from a body of psychological study found in textbooks and taught in classes and seminars. She testified to specific standards developed by a limited community of professionals, standards most likely unknown to a layperson. Her training, research, and evaluation of the tape qualified her to give an opinion concerning the interview techniques used by the detectives. Indeed, the fact that the detective who was the primary interviewer attended courses in interviewing children speaks of the necessity for training and education beyond that found from the experience of everyday life.

This information would have been helpful and necessary to assist the jury in assessing the videotape. As argued by defense counsel to the trial court, the information the expert would have shared with the jury "comes from some body . . . some authority . . . an authority that has been studied, considered, digested, and can be applied, and opined about by" his expert. Without this information, although the trial court ruled that counsel could argue about certain aspects of the videotape, the jury did not have the benefit of psychological information needed to evaluate the *effect* of the techniques. In short, the jury was deprived of a "yardstick" against which to measure the arguments of counsel.

It is important to emphasize that to the extent Barlow intended that his expert testify concerning the victim's credibility, such testimony was clearly impermissible; any determination concerning witness credibility is a matter solely within the jury's province. See, e.g., *Gorski v. State*, 201 Ga. App. 122, 123 (2) (410 SE2d 338) (1991). But insofar as Barlow sought to introduce the testimony for the limited purpose of sharing a body of knowledge concerning the proper method of interviewing a child and the possible effect of techniques such as those used here, the trial court erred in excluding the expert's testimony.

I am authorized to state that Presiding Judge Birdsong joins in this opinion.

*Cauthorn & Phillips, Thomas E. Cauthorn III, Bruce W. Phillips,* for appellant.

*Thomas J. Charron, District Attorney, Frank R. Cox, James Albertelli, Assistant District Attorneys,* for appellee.